UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 5:14-cv-2029-MHH |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ALABAMA, for | ) | |
| and on behalf of THE UNIVERSITY | ) | |
| OF ALABAMA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In her lawsuit against the University of Alabama-Huntsville, Jane Doe alleges that UAH violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., because the university discriminated against her and was deliberately indifferent in its handling of her sexual assault charge against another student. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, UAH has asked the Court to enter judgment in its favor. For the reasons stated below, the Court denies the motion.[1]

---

[1] This case initially was assigned to a magistrate judge under the district court's former civil case assignment procedure. Consequently, the magistrate judges assigned to this case have issued reports concerning the parties' dispositive motions. In his thoughtful report concerning UAH's summary judgment motion, the magistrate judge recommended that the Court grant the motion for summary judgment. (Doc. 56). Ms. Doe objects to several of the magistrate judge's factual findings, and she objects to his legal conclusions. (Doc. 57). Because the parties have not

# I.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to

---

consented unanimously to dispositive jurisdiction by a magistrate judge, the magistrate judge's report and Ms. Doe's objections are before the undersigned for review.

A district court "may accept, reject, or modify, in whole or part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  When a party objects to a report and recommendation, a district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  *Id.* Although § 636(b)(1) "does not require the [district] judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard."  *Thomas v. Arn*, 474 U.S. 140, 154 (1985).  That is because for dispositive issues, "the ultimate adjudicatory determination is reserved to the district judge."  *United States v. Raddatz*, 447 U.S. 667, 675 (1980).  For purposes of this opinion, the Court has made a *de novo* review of the record.

the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). Accordingly, where the evidence is disputed, the Court presents the evidence in the light most favorable to Ms. Doe and describes, where relevant, the UAH's version of the events at issue.

## II.    TITLE IX STANDARD

Pursuant to Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "The Supreme Court has recognized an implied right of action for money damages in Title IX cases of intentional sexual discrimination . . ." *Doe v. School Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1254 (11th Cir. 2010). "[S]exual harassment is a form of discrimination for Title IX purposes," *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 649-50 (1999), "and in certain narrow circumstances, a plaintiff may be able to recover for student-on-student harassment," *Williams v. Bd. of Regents of Uni. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007).

The standard for Title IX liability in cases involving student-on-student harassment is exacting. "Student-on-student sexual harassment rises to the level of actionable Title IX discrimination only if the harassment is 'sufficiently severe.'" *Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015) (quoting *Davis*, 526 U.S. at 650).

In a student-on-student Title IX action, a plaintiff "must establish not only that the school district was deliberately indifferent to known acts of harassment, but also that the known harassment was 'so severe, pervasive, and objectively offensive that it denie[d] its victims the equal access to education that Title IX is designed to protect.'" *Hill*, 797 F.3d at 968-69 (quoting *Davis*, 526 U.S. at 651-52).

Per *Davis*, the standard for student-on-student Title IX liability is particularly rigorous in cases involving elementary and high school students. *Hill*, 797 F.3d at 970. "The high burden of *Davis* ensures school districts are not financially crippled merely because immature kids occasionally engage in immature sexual behavior." *Hill*, 797 F.3d at 970. In *Hill*, the Eleventh Circuit Court of Appeals stated:

> The Court imposed this high standard to guard against the imposition of "sweeping liability." Unlike an adult workplace, children "may regularly interact in a manner that would be unacceptable among adults." Due to their immaturity, children at various ages will invariably engage in some forms of teasing, shoving, and name-calling that "target differences in gender." Some risk of sexual harassment is inherent to the enterprise of public education, in particular, because public schools must educate even the most troublesome and defiant students.

*Hill*, 797 F.3d at 969 (quoting *Davis*, 526 U.S. at 651-52); *see also* Davis, 527 U.S. at 666 (Kennedy, J. dissenting).

This case does not involve school children teasing or name-calling. This case does not involve First Amendment speech on a college campus. *See Davis*, 526 U.S. at 649 (noting that a university cannot "be expected to exercise the same degree of control over its students that a grade school would enjoy, and it would be entirely

4

reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims"), and *Davis,* 526 U.S. at 667-68 (discussing the First Amendment implications for a university's effort to discipline a student for verbal sexual harassment) (Kennedy, J. dissenting).  This case concerns known instances of forced sex on a university campus that the university chose not to address, and it involves the university's handling of the sexual assault of Ms. Doe by a member of the university's hockey team.  Because the Eleventh Circuit Court of Appeals' analysis in *Williams* concerns sexual misconduct of athletes on a university campus, *Williams* provides the best guidance for the evaluation of Ms. Doe's student-on-student Title IX claim.

For a university to be held liable under Title IX for sexual assault of a plaintiff by a university student, the plaintiff must demonstrate that the university receives Title IX funds, that an "appropriate person" had actual knowledge of the discriminatory or harassing conduct that the plaintiff alleges, that "the funding recipient act[ed] with deliberate indifference to known acts of harassment in its programs or activities," and that the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit."  *Williams*, 477 F.3d at 1293 (quoting *Davis,* 526 U.S. at 633).

For purposes of a claim for damages for deliberate indifference under Title IX, an "appropriate person" is, "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination" or harassment. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

A plaintiff cannot establish deliberate indifference by a funding recipient simply by demonstrating that "a person affiliated with the funding recipient discriminated against or harassed the plaintiff." *Williams*, 477 F.3d at 1293. Rather, a Title IX plaintiff must establish that the funding recipient's response to sexual harassment was clearly unreasonable "'in light of the known circumstances.'" *Williams*, 477 F.3d at 1295 (quoting *Davis*, 526 U.S. at 648); *see also Davis*, 526 U.S. at 648-49. A university may be held liable for a clearly unreasonable response to known sexual harassment because the unreasonable response makes a Title IX plaintiff vulnerable to "further discrimination" or sexual harassment by the initial perpetrator or by "like-minded hooligans." *Williams*, 477 F.3d at 1295-97.

A plaintiff may prove that the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit," *Davis,* 526 U.S. at 633, by demonstrating that the funding recipient "failed to take any precautions that would prevent future attacks" from the harasser "by, for example, removing from student housing or suspending the alleged

assailants, or implementing a more protective sexual harassment policy to deal with future incidents." *Williams*, 477 F.3d at 1297.

> "Whether gender-oriented conduct rises to the level of actionable 'harassment' [] 'depends on a constellation of surrounding circumstances, expectation[s], and relationships,' including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." "[T]o have a 'systemic effect' of denying the victim equal access to an educational program or activity ... gender discrimination must be more widespread than a single instance of one-on-one peer harassment ...."

*Williams*, 477 F.3d at 1297-98 (quoting *Davis*, 526 U.S. at 651 and *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003)) (second alteration added to reflect actual language from *Davis*). A "cycle of discrimination and deliberate indifference that last[s] for more than one year" may effectively bar a plaintiff's access to educational opportunities. *Williams*, 477 F.3d at 1298.

Here, it is undisputed that the UAH receives Title IX funds and that an "appropriate person" was aware of Ms. Doe's assault and of previous instances of student-on-student sexual assault on UAH's campus. Therefore, to resolve the Board's summary judgment motion, the Court must determine whether Ms. Doe has identified disputed issues of fact concerning deliberate indifference and access to educational opportunities.

## III. DISCUSSION

### A. Ms. Doe's rape by a UAH hockey player and UAH's response

The facts that give rise to Ms. Doe's Title IX claims are largely undisputed. In January 2013, a UAH hockey player sexually assaulted Ms. Doe, a UAH student, in a UAH dorm room. After drinking a lot of wine, Ms. Doe fell asleep on the sofa in a suite in the dormitory in which the members of UAH's hockey team lived. (Doc. 53-1, p. 8, tpp. 22-23; Doc. 53-1, p. 50; Doc. 54-1, pp. 1-2, ¶¶ 3-4). A UAH hockey player, who Ms. Doe later learned was L.U., awakened her during the night and told her that she could not stay in the room in which she was sleeping. L.U. gathered Ms. Doe's things and led her to a room in a suite on another floor of the dormitory. (Doc. 53-1, pp. 50-51). She entered one of the bedrooms and lay on the bed. L.U. lay beside her and began removing her clothes. (Doc. 53-1, pp. 51, 53). In L.U.'s words, he then "tried to have sex" with Ms. Doe. (Doc. 53-1, p. 53).

In the handwritten report that he completed less than eight hours after his encounter with Ms. Doe, L.U. stated that he "had [his] penis in her [a] very short period of a time and [he] told [him]self I have to stop." (Doc. 53-1, p. 53). L.U. wrote: "I stopped because she seemed to be drunk and didn't know what was going on. She never said 'NO' or 'stop', but I realized that she couldn't consent." (Doc. 53-1, pp. 53-54). L.U. wrote that after he decided to stop, he dressed Ms. Doe again

and took her to the suite where he found her. (Doc. 53-1, pp. 52-53; *see also* Doc. 54-1, p. 2, ¶ 8).

Sergeant John Beswick, a UAH police officer, investigated the event. In his report, Sergeant Beswick wrote that after he mirandized L.U., L.U. stated that he lay in bed with Ms. Doe, began removing her clothes, and "inserted his fingers into her vagina and then got on top of her and inserted his penis into her vagina." (Doc. 53-1, p. 49). L.U. told Sergeant Beswick that "after engaging in sexual intercourse for approximately ten seconds, he stopped and got off her because 'she seemed to be drunk and didn't know what was going on.'" (Doc. 53-1 p. 49).

Ms. Doe asserts that she "did not give consent to sexual contact" and was not capable "of giving such consent." (Doc. 54-1, p. 2, ¶¶ 5-7). Shortly after the assault, Ms. Doe went to UAH's Crisis Services for an examination. The exam results indicated that Ms. Doe experienced "vaginal tearing." (Doc. 53-3, p. 16). The day following the assault, in an interview with UAH Dean of Students Dr. Regina Hyatt, Ms. Doe stated that "she did not participate in taking her clothes off, [L.U.'s] clothes off, or in the intercourse." (Doc. 53-3, p. 16).[2] In an interview with Dr. Hyatt a few days after the incident, L.U. reported that he "had been drinking and was intoxicated

---

[2] Dr. Hyatt was UAH's Deputy Title IX Coordinator. (Doc. 53-3, p. 3). Dr. Hyatt handled all Title IX and sexual violence-related complaints. (Doc. 53-2, p. 5, tp. 11).

but knew what was going on." (Doc. 53-3, pp. 17, 25).[3] At the time of the assault, L.U. was on disciplinary probation at UAH for alcohol abuse and hazing violations. The assault occurred nearly four months into L.U.'s approximately eight-month probationary period. (Doc. 53-7, pp. 32-33).[4]

Sergeant Beswick and Dr. Hyatt advised Ms. Doe that she could pursue criminal charges against L.U. or she could bring charges against L.U. under UAH's Student Conduct Code. Ms. Doe pursued charges against L.U. under UAH's Student Conduct Code for sexual violence and violations of law, order, or University regulations or sanctions. (Doc. 53-7, pp. 8-9). With respect to the sexual violence charge, the Student Conduct Code prohibited "[p]hysical sexual assaults against a person's will or where a person is incapable of giving consent due to the victim's impairment by drugs or alcohol . . ." (Doc. 53-7, p. 8). With respect to the violation of law charge, the Student Conduct Code prohibited "[v]iolation of any federal, state, or local law." (Doc. 53-7, p. 8). "Sanctions which can be imposed is a student is found responsible for sexual misconduct or violence include the full range of sanctions outlined in the Student Code of Conduct." (Doc. 53-7, p. 71). "Sanctions

---

[3] During a hearing before the Student Conduct Board, L.U. stated that he was not intoxicated at the time of the incident. (Doc. 53-3, p. 31).

[4] The Court has found nothing in the record that explains how L.U. ended up in the third-floor room where Ms. Doe was sleeping. Jurors could reasonably infer that L.U. – a student on probation for alcohol abuse and hazing – who had been drinking on the evening in question was walking through his dorm drunk, opening unlocked doors.

may include probation, suspension, and expulsion even for a first time offense." (Doc. 53-7, p. 71).[5]

Under Alabama law, "[a] person commits the crime of rape in the first degree if he or she . . . [e]ngages in sexual intercourse with another person who is incapable of consent by reason of being incapacitated." Ala. Code § 13A-6-61(a)(2). "[S]exual intercourse" under Alabama law "occurs upon any penetration, however slight; emission is not required." Ala. Code § 13A-6-60(4). Under Alabama law, the term "incapacitated" includes:

> b. A person [who] is temporarily incapable of appraising or controlling his or her conduct due to the influence of a narcotic, anesthetic, or intoxicating substance and the condition was known or should have been reasonably known to the offender.

> c. A person who is unable to give consent or who is unable to communicate an unwillingness to an act because the person is unconscious, asleep, or is otherwise physically limited or unable to communicate.

Ala. Code § 13A-6-60(2).

On February 11, 2013, by a preponderance of the evidence, UAH's Student Conduct Board found L.U. guilty of sexual violence and violation of the law and recommended that UAH expel L.U. (Doc. 53-7, pp. 9-10).[6] The Student Conduct

---

[5] Before the formal Student Conduct Board proceeding began, Dr. Hyatt reached out to L.U. to let him know that if he would accept responsibility for sexual violence, she would recommend a one-year suspension. L.U. was not willing to accept responsibility. (Doc. 53-3, p. 36).

[6] The Student Conduct Board consisted of three faculty members and two graduate students. (Doc. 53-7, p. 16).

Board believed that the sanction of expulsion "must be made for the safety of all students at UAH." (Doc. 53-3, p. 31). When the Board rendered its decision, the members of the Board did not know that L.U. already was on probation for a prior code violation. (Doc. 53-3, p. 31).

On February 22, 2013, UAH's Student Conduct Director gave L.U. written notice of the Board's recommendation and advised L.U. of his ability to appeal. (Doc. 53-7, p. 8). In a letter addressed to Associate Provost Dr. Brett Wren, L.U. appealed to challenge the sanction of expulsion. Dr. Wren was UAH's Title IX appeal officer for sexual misconduct cases. (Doc. 53-7, p. 7). Dr. Wren presided over L.U.'s appeal and had the authority to impose the expulsion sanction or select a different consequence. (Doc. 53-7, p. 16). In his appeal letter, L.U. stated that "[l]osing his scholarship, education and chance to play in the [Western Collegiate Hockey Association] would be the end of the world for me. Therefore, I am willing to do whatever it takes to keep my scholarship and graduate from here." (Doc. 53-7, p. 11). Ultimately, Dr. Wren suspended L.U. for two semesters and delayed the suspension until the summer semester. (Doc. 53-10, p. 2).

**B. Viewed in the light most favorable to Ms. Doe, the evidence demonstrates that UAH acted with deliberate indifference to known acts of sexual assault.**

In many respects, the evidence of deliberate indifference in this case closely resembles the factual allegations in *Williams*. Therefore, to provide a backdrop for

the analysis of Ms. Doe's evidence, the Court first describes the conduct that allowed Ms. Williams's Title IX claim to proceed.

- *Williams v. Bd. of Regents*

Ms. Williams was a student at the University of Georgia when a UGA football player sexually assaulted her and a UGA basketball player sexually assaulted and raped her. *Williams*, 477 F.3d at 1288. After reporting the assaults to UGA police and pressing charges against the players who assaulted her and the player who instigated the assault, Ms. Williams withdrew from UGA. *Williams*, 477 F.3d at 1289.[7] The players "were charged with disorderly conduct under UGA's Code of Conduct." 477 F.3d at 1289. One year later, a UGA judiciary panel decided not to sanction the players, two of whom, by the time of the panel decision, no longer were UGA students. 477 F.3d at 1289.

In her Title IX complaint, Ms. Williams alleged that UGA's basketball coach recruited the instigator of her assault even though the coach knew that the player had had disciplinary problems and had been charged criminally while attending other schools. Ms. Williams also alleged that the President of UGA, who was aware of the player's disciplinary and criminal past, had to admit the basketball player to

---

[7] A UGA basketball player arranged for two UGA football players and a UGA basketball player to assault Ms. Williams. 477 F.3d at 1288.

UGA under a special admissions policy because the player "did not meet UGA's standards for admissions." 477 F.3d at 1290.

The Eleventh Circuit Court of Appeals explained that Ms. Williams identified "three forms of discrimination or harassment" that she faced: UGA's recruitment of the instigator of the sexual assault, despite knowledge of his prior misconduct; her sexual assault by the football and basketball players; and UGA's failure to respond adequately to her assault charges against the athletes. 477 F.3d at 1294. The Court of Appeals stated that UGA's recruitment of the instigator of Ms. Williams's assault with knowledge of his past conduct was an act of deliberate indifference on the part of the university but stated that Ms. Williams could not prove a Title IX violation unless she established that the university's initial act of "deliberate indifference subjected her to further discrimination." 477 F.3d at 1296. The Court of Appeals held that Ms. Williams satisfied the "further discrimination" requirement because she alleged that UGA placed the athlete with a known history of disciplinary problems in a student dorm without supervising him or advising him of the university's sexual harassment policy. 477 F.3d at 1296. Ms. Williams also satisfied the "further discrimination" requirement for Title IX liability through her allegations concerning UGA's response after she reported the assault. 477 F.3d at 1296.

With respect to the university's response to Ms. Williams's report of the assault, the Court of Appeals found that UGA police "performed a thorough

investigation," and that investigation "provided substantial evidence corroborating Williams's version" of the assault and rape. 477 F.3d at 1296-97. Nevertheless, UGA waited eight months after it received the final police report to "conduct[] a disciplinary hearing to determine whether to sanction the alleged assailants." 477 F.3d at 1296. During that period, the university did nothing to prevent additional attacks by Ms. Williams's assailants, such as suspending them or removing them from student housing. 477 F.3d at 1297.

The Court of Appeals found that the discrimination that Ms. Williams alleged was "more widespread than a single instance of one-on-one peer harassment" and that the discrimination was "severe, pervasive, and objectively offensive" because Ms. Williams suffered "two separate acts of sexual assault" by fellow students under the direction of another student. 477 F.3d at 1297-98 (quoting *Davis*, 526 U.S. at 633 and *Hawkins v. Sarasota County Sch. Bd.*, 322 F.3d 1279, 1285 (11th Cir.), *reh'g and reh'g en banc denied*, 67 Fed. Appx. 590 (11th Cir. 2003)). The Court of Appeals stated that this "continuous series of events" was "sufficient to meet the requirements of severity and objective offensiveness." 477 F.3d at 1298. The assaults, coupled with the university's alleged discrimination before and after the assaults, if proven, would be sufficient "to show that the discrimination was pervasive." 477 F.3d at 1298.

Turning to the evidence in this case, in her opposition to UAH's motion for summary judgment, Ms. Doe identified "[four] forms of discrimination or harassment" that she faced at the university: UAH's failure to address known instances of student-on-student sexual assault, UAH's effort to discourage her from pursuing criminal charges against her assailant, UAH's decision to allow L.U. to remain enrolled at the university after he admitted to sexual assault, and UAH's support and protection of L.U. (Doc. 54, pp. 24-28). Viewed in the light most favorable to Ms. Doe, she has presented sufficient evidence to support these alleged acts of harassment and discrimination, and much of the evidence of discrimination is undisputed.

- UAH's failure to address known instances of student-on-student sexual assault

When Dr. Wren evaluated L.U.'s appeal of the Student Conduct Board's recommended sanction of expulsion, Dr. Wren reflected on the fact that several UAH students were victims of sexual assaults by other students, but UAH did not charge the assailants with violations of the UAH's Student Code of Conduct. In an email to Dr. Hyatt, Dr. Wren wrote:

> It's just that we have people walking around this campus that are known to have committed worse sexual conduct than [L.U.] and they were never charged. I'm wondering if the board would consider that in evaluating whether this case should have been brought or not.

(Doc. 53-7, p. 15). In a later message in the same email strand, Dr. Wren wrote to Dr. Hyatt:

> [W]e have chosen not to file charges in at least two known instances of forced sex. We have a third one right now where a girl alleges excessively rough sex from a guy and we aren't pursuing him either. If [I] was a lawyer I would be all over that. I don't want us to get there if we can avoid it.

(Doc. 53-7, p. 15). At the time of Ms. Doe's assault, UAH had not "expelled anyone for anything other than severe academic misconduct." (Doc. 53-7, p. 17; *see also* Doc. 53-3, p. 38).

To assist Dr. Wren in his investigation of L.U.'s appeal, Dr. Hyatt collected information about recorded instances of student-on-student sexual assaults that preceded L.U.'s 2013 assault of Ms. Doe. Dr. Hyatt provided the following information to Dr. Wren concerning "Sexual Misconduct/Violence" in a document entitled "History of Suspension/Expulsion Sanctions":

- Spring 2011

    o Non-student assaulted by students. Complaint filed with University Police and adjudicated through Student Conduct process. Students found responsible in hearing with University Judicial Board and allowed to voluntarily withdraw in lieu of separation.

    o Student filed complaint against another student via the Student Code of Conduct. Student found not responsible in hearing with University Judicial Board.

- Fall 2011

  - Female student makes complaint with University Police regarding a sexual assault and through the course of the investigation, it was determined the report was unfounded. Female student subsequently recanted statement and ultimately withdrew from school.

- Spring 2012

  - Female student states in an appeal form to Financial Aid she was sexually assaulted. Student was contacted by University Police and refused to file a complaint about incident.

  - Female student makes complaint with University Police regarding a sexual assault and recanted statement before any actions could be taken. Female student subsequently charged with filing a false report through Student Code of Conduct. She accepted responsibility and was sanctioned.

- Fall 2012 (please note new Title IX procedures were put in place during this term)

  - Female student makes report to University Police and subsequently a complaint. Student is temporarily suspended as emergency measure. Hearing on emergency measure held, student subsequently withdraws before Student Code of Conduct process could take place.

  - Female student makes disclosure to faculty member. RYH conducts Title IX investigation but female student refused to file a complaint about incident. Investigation document available upon request.

- Spring 2013

  - Female student makes report to University Police and subsequently a complaint which is adjudicated through the

> > Student Code of Conduct. RYH conducts Title IX investigation and investigation document available upon request. Student found responsible in hearing with Student Conduct Board and expelled.[8]
>
> > o Female student makes disclosure to resident assistant. RYH conducts Title IX investigation but female student refused to file a complaint about incident. Investigation document available upon request.

(Doc. 53-7, pp. 18-19).

After reviewing the information that Dr. Hyatt provided, Dr. Wren, "based on [his] knowledge of the events," wrote in an email to his immediate superior Dr. Vistasp Karbhari, UAH's Provost and Executive Vice President, (Doc. 53-2, p. 7, tp. 21):

> The first Spring 2011 incident is the one with the [redacted]. They were slated to be suspended but never returned to school.
>
> The first Spring 2012 one is bothersome because we did not pursue anything on her behalf.
>
> The first Fall 2012 incident is the one in the [redacted] that was clearly rape. I was not aware that the student withdrew from school.
>
> The first Spring 2013 incident is [L.U.].
>
> The second Spring 2013 incident is the one that [Dr. Hyatt] refuses to pursue without the consent of the girl.

(Doc. 53-7, p. 17).

---

[8] This incident pertains to L.U.'s assault of Ms. Doe. (Doc. 52-7, p. 17). As noted, though the Student Conduct Board recommended expulsion, Dr. Wren overrode the recommendation and imposed a two-semester suspension beginning with the Summer 2013 semester. L.U. withdrew from UAH before the suspension took effect.

In short, in Dr. Wren's words, in the semesters preceding Ms. Doe's assault, UAH had "chosen not to file charges in at least two known instances of forced sex," and UAH, to Dr. Wren's knowledge, had "never expelled anyone for student misconduct absent criminal activity." (Doc. 53-7, p. 15). UAH's Student Conduct Board had fully adjudicated one sexual assault case. The victim in that case was not a student, and UAH allowed the student assailants "to voluntarily withdraw in lieu of suspension." (Doc. 53-7, p. 18). In the semesters preceding Ms. Doe's assault, UAH expelled one student for academic misconduct. (Doc. 53-7, p. 18).[9]

- The August 2013 assault

Although Ms. Doe did not list it as an instance of discrimination, consistent with *Williams*, L.U.'s sexual assault of Ms. Doe is an instance of discrimination.

- UAH's effort to discourage criminal proceedings

With respect to Ms. Doe's argument that UAH tried to discourage her from bringing criminal charges, Ms. Doe recounts that when Sergeant Beswick interviewed her a few hours after the assault, he told her "that 'people who hang out at the hockey dorm share girls all the time' and that it 'was completely normal and ok to have sex with someone [Ms. Doe] didn't know.'" (Doc. 54-1, p. 2, ¶ 10). Ms. Doe told Sergeant Beswick "that if he did not plan on taking the matter seriously

_____

[9] There is a notation at the top of Doc. 53-7, p. 18 that states, "Spring 2013: Sexual violence – expulsion." The notation concerns L.U.'s assault on Ms. Doe. Again, Dr. Wren decided to overrule the Student Conduct Board and suspend L.U. rather than expel him.

that [she] didn't want him to contact [her] rapist because [she] was afraid [the rapist] would retaliate." (Doc. 54-1, p. 2, ¶ 12).[10] Ms. Doe attests that the following day, Sergeant Beswick told her that L.U. "had confessed to rape," but she "would still never win in a court of law." (Doc. 54-1, p. 3, ¶ 13). According to Ms. Doe, Sergeant Beswick "encouraged [her] to pursue the matter through the UAH Conduct Board, and [she] agreed to do so." (Doc. 54-1, p. 3, ¶ 13).[11]

---

[10] Sergeant Beswick testified that he told Ms. Doe:

> if she had engaged in intercourse with this guy and that – nobody was judging her. If she was – she was a young lady, if she made a mistake in judgment, no one was there to judge her. I just had to know that what she was saying was the truth. She said that it wasn't an error in judgment. She said that it was not her choice. And based on her responses, then I said okay.

(Doc. 53-1, p. 7, tp. 20). Sergeant Beswick added:

> anytime I get a complaint like this, I always give the purported victim a way out without losing face. Sometimes young people, male or female, have – make a mistake in judgment. Because of the seriousness of the case, I just needed to verify that what she was telling me was in fact the truth. She was very adamant about it, so I said okay.

(Doc. 53-1, p. 7, tp. 21). A jury will have to determine which version of the conversation to believe; credibility determinations are the province of the factfinder.

Sergeant Beswick testified that after he saw that Ms. Doe was adamant about the fact that she had not consented to having sexual intercourse with L.U., he (Sergeant Beswick) "gave her the various options that were available to her, and [he] told her it was her choice." (Doc. 53-1, p. 8, tp. 23). Sergeant Beswick testified that he told Ms. Doe that she could prosecute and that she "would have to testify to [her] knowledge and so on." (Doc. 53-1, p. 8, tpp. 23-24). He told Ms. Doe that her second option was to "take it to the university student conduct board," which could levy sanctions against her assailant if the board found him guilty. (Doc. 53-1, p. 8, tp. 24). And Sergeant Beswick explained to Ms. Doe that her third option "was to do nothing." (Doc. 53-1, p. 8, tp. 24). Sergeant Beswick testified that he told Ms. Doe that he worked for her and that he would do whatever she wanted him to do. (Doc. 53-1, p. 8, tp. 24).

[11] In her report concerning her meeting with Ms. Doe the day after the assault, Dr. Hyatt wrote that she explained to Ms. Doe that she (Ms. Doe) had three options: filing a criminal complaint, filing a "student code of conduct complaint, or do neither." (Doc. 53-3, p. 16). Dr. Hyatt continued:

As noted above, when he received L.U.'s appeal of the Student Conduct Board's decision, Dr. Wren asked in an email whether the Student Conduct Board might reconvene and consider "whether this [Student Conduct Code] case should have been brought or not." (Doc. 53-7, p. 15).[12]

Weeks after Dr. Wren reduced L.U.'s sanction to a deferred suspension, Ms. Doe filed criminal charges against L.U., and UAHPD arrested L.U. and charged him with first degree rape. (Doc. 53-1, pp. 43-44; Doc. 53-2, p. 32, tp. 119; Doc. 53-6, p. 37, tpp. 139-140; Doc. 53-15, pp. 2-3; Doc. 54-1, p. 3, ¶ 20). At the request of L.U.'s family, hockey coach Kleinendorst posted bail for L.U. on April 1, 2013, the day of the arrest. (Doc. 53-7, p. 54). The following day, Coach Kleinendorst tweeted: "Things are not always what they seem. Be careful to judge." (Doc. 53-

---

At the time of our conversation, she was unsure what she wanted to do but was leaning toward the student code of conduct complaint. She did not wish to pursue the criminal charge. . . . At the conclusion of our meeting, [Ms. Doe] indicated that she was going to go back over to Campus Police to talk with Sgt. Beswick. Within an hour or so from that time, I received a call from University Police indicating that [Ms. Doe] asked the Campus Police to file a student code of conduct complaint.

(Doc. 53-3, p. 16).

[12] If UAH's effort to discourage her from pursuing criminal charges was the only instance of discrimination that Ms. Doe alleged, she likely would not have enough evidence to overcome UAH's motion for summary judgment because the record shows that both Officer Beswick and Dr. Hyatt discussed with Ms. Doe her options. (Doc. 53-5, p. 2; Doc. 53-2, p. 5, tp. 12). In her email to Dr. Hyatt explaining her decision, Ms. Doe wrote: "it was a hard decision, but I think it is the best option." (Doc. 53-2, p. 2). Dr. Wren's suggestion that Ms. Doe should not have pursued charges under UAH's Code of Conduct is another matter entirely.

14, p. 2).[13]  Coach Kleinendorst explained that he paid L.U.'s bail because "he did not believe it would be right to turn his back on a kid in trouble, especially one with no family in the country."  (Doc. 53-7, p. 56).

Over the next few weeks, "the District Attorney and lawyers from both sides" arranged for L.U., a native of Finland, "to leave the country in exchange for the [criminal] charges not being pursued."  (Doc. 53-7, p. 55; *see also* Doc. 54-1, p. 4, ¶ 22).  The District Attorney gave L.U. his passport and rescinded L.U.'s bond so that L.U. "would not be in violation of terms of bail if he left the country."  (Doc. 53-7, p. 55).

- UAH's decision to allow L.U. to remain enrolled at the university

After Ms. Doe reported her sexual assault, UAH initially elected not to impose "emergency measures" which would have removed L.U. from campus because Dr. Hyatt did not consider L.U. to be an "ongoing threat."  (Doc. 53-2, p. 7, tp. 21).  Instead, UAH issued a "no contact" order to L.U.  (Doc. 53-2, pp. 7-8, tpp. 21-22).[14]  Shortly after she learned from Ms. Morgan that the Student Conduct Board had voted

---

[13]  L.U.'s family eventually reimbursed Coach Kleinendorst, but UAH concluded that the payment constituted a secondary violation of NCAA rules.  (Doc. 53-7, p. 53).  UAH self-reported the violation to the NCAA on May 28, 2013.  (Doc. 53-7, pp. 54-56).

[14]  When Officer Beswick delivered Ms. Doe's complaint to UAH administrators, Ms. Morgan drafted a conduct letter to L.U. that explained the charges against him.  (Doc. 53-2, p. 6, tp. 14).  Dr. Hyatt issued a no-contact order that Ms. Morgan included in the letter.  The order directed L.U. not to have contact with Ms. Doe or her friends.  (Doc. 53-2, pp. 7-8, tpp. 21-22).

to expel L.U., Ms. Doe saw L.U. on campus and became shocked and upset. (Doc. 54-1, p. 3, ¶ 15).

After the Student Conduct Board recommended that UAH expel L.U., while Dr. Wren was considering L.U.'s appeal, Dr. Wren wrote in an email to Dr. Hyatt:

> the code of conduct says that suspensions that are levied after the 8th week of class will allow the student to complete the semester as long as there is not a risk of harm to the campus or other students. Is [L.U.] considered a risk?

(Doc. 53-3, p. 12). Dr. Hyatt replied: "In general, I would say that any student found responsible for sexual violence is a risk to the campus community." (Doc. 53-3, p. 11). Dr. Wren forwarded Dr. Hyatt's response to UAH President Robert Altenkirch and Dr. Karbhari with the remark: "Here we go again." (Doc. 53-3, p. 11).[15]

• UAH's support and protection of Ms. Doe's assailant

The evidence of UAH's overriding concern for L.U. is abundant. President Altenkirch wanted to know why Ms. Doe was not charged with alcohol use. (Doc. 53-3, p. 13).[16]

Dr. Karbhari asked the Student Conduct Board to reconvene to reconsider the expulsion sanction. (Doc. 53-2, pp. 9-10, tpp. 29-32; Doc. 53-3, pp. 4-5). Dr.

---

[15] In his deposition, Dr. Wren testified that he does not know what he meant by that remark. (Doc. 53-6, p. 28, tp. 104).

[16] Dr. Hyatt replied that victims of sexual assault typically were granted amnesty for student code violations because sanctioning victims would chill victims' willingness to report sexual assault. (Doc. 53-3, p. 13).

Karbhari did not attend the meeting, but he suggested alternative disciplinary measures for consideration such as alcohol and drug treatment (a sanction already imposed on L.U. during his term of probation for his previous Student Conduct Code violation, (Doc. 53-3, p. 26)) and sexual violence education. (Doc. 53-2, pp. 10-11, tpp. 32-34).[17] Dr. Hyatt reconvened the Board, and the Board refused to adjust the sanction. (Doc. 53-2, p. 10, tp. 31; 53-3, p. 5).[18]

Dr. Wray, the Student Conduct Board Chair for Ms. Doe's case (Doc. 53-3, p. 20), wrote the following explanations for the Board's decision:

1. [L.U.] had never met [Ms. Doe] . . .

. . .

8. We need to make sure that this doesn't happen to anyone else.

9. Not expelling him sends the wrong message to women on campus and fears that he [may] perpetrate similar infractions.

10. We felt that there was preponderance of evidence that he raped her.

(Doc. 53-3, p. 4). In a typewritten explanation of the Student Conduct Board's decision, Dr. Wray stated:

[L.U.] admitted that he had gone to the third floor of [his dorm], escorted [Ms. Doe] down the stairs to his room on the second floor, and had sex with [Ms. Doe]. In his testimony, [L.U.] stated that while

---

[17] Pursuant to UAH's Student Conduct Code, the Provost and Executive Vice President—at the time, Dr. Karbhari—was to review the outcome of the hearings. (Doc. 53-2, p. 9, tp. 27).

[18] Dr. Hyatt testified that this was the only time during her tenure that UAH officials had reconvened a Student Conduct Board disposition. (Doc. 53-2, p. 11, tp. 37).

having sex with [Ms. Doe], he recognized that she was intoxicated. The board felt that [L.U.] would have noticed that Ms. [Doe] was incapacitated when he first found her covered with a blanket and asleep on a couch. Further, it was felt by the board that [Ms. Doe] would have had trouble walking down the stairs if she had consumed such a large quantity of wine and [L.U.] would have noticed this.

. . .

[L.U.] admitted to having sex with the person that was incapacitated due to alcohol consumption which is a violation of 13a. of the Student Code of Conduct. Further, the board determined that [L.U.] violated 15d. of the Student Code of Conduct through "violation of federal, state, and local law."

The Hearing Board feels that expulsion is an appropriate sanction due to the severity of the infraction and that [L.U.] is currently on probation for other incidents on campus.

(Doc. 53-3, p. 20).

Dr. Wren believed the sanction of expulsion was too severe, and he did not want to "forever change" L.U.'s future. He preferred suspension because the university had suspended students in the past for sexual assaults. (Doc. 53-3, p. 12). In an email message to Dr. Hyatt, Dr. Wren wrote:

Before I send some kid home for good and forever change his life, I want to be sure that all evidence was on the table and that the case is treated consistently with our past behavior. There is a better than likely chance that he will sue the university over the expulsion, so we had better be certain that there are no holes or gaps in the case, and that we can't be accused of treating him an[y] differently from other similar cases.

(Doc. 53-7, p. 15).[19]  In a March 2013 letter to L.U. explaining the outcome of his appeal, Dr. Wren stated that L.U. was "on probation for a code of conduct violation (incident number 2012/13-0018)" when he assaulted Ms. Doe, that L.U. had violated his probation, and that L.U. was suspended for two academic semesters but the term of suspension was "deferred until the end of the Spring 2013 semester."  (Doc. 53-3, p. 28).  UAH suspended L.U. for the Summer 2013 and Fall 2013 semesters, banned L.U. from UAH extracurricular activities and university training facilities until January 2, 2014, re-imposed a no-contact order, and advised L.U. that future Student Conduct Code violations of any type would result in immediate expulsion. (Doc. 53-10, p. 2).

Nothing in the record indicates that Dr. Wren or any "appropriate person" at UAH expressed concern for how rape would, paraphrasing Dr. Wren, "forever change [Ms. Doe's] life."  There is no evidence that Dr. Wren, before he decided to allow L.U. to complete his spring semester on campus, asked Ms. Doe what

---

[19] In addition to serving as the Associate Provost, Dr. Wren served as the Faculty Athletic Representative, a position which provided a liaison between UAH's athletic teams and the administration to ensure that the Athletics Department remained compliant with university policy and procedures.  (Doc. 53-6, p. 4, tp. 33).  Dr. Wren described this position as the "president's eyes and ears in athletics" as well as "a go-between between academic affairs and athletics." (Doc. 53-6, pp. 4-5, tpp. 9-10).  Initially, L.U. asked Dr. Wren to serve as his faculty advisor for his hearing before the Student Conduct Board.  (Doc. 53-6, p. 10, tp. 32; Doc. 53-7, p. 7).  Dr. Wren told L.U. that he could not serve as his advisor because he (Dr. Wren) "would be involved in the appeals process later."  (Doc. 53-6, p. 10, tp. 33).  Reasonable jurors could conclude that Dr. Wren's effort to protect L.U. from the severe sanction of expulsion was not about his concern over potential litigation but about his relationship with UAH's hockey team.

protection she might feel she needed if she and L.U. were both living on campus. There is no evidence that UAH offered Ms. Doe any type of support or accommodation to help her cope with her rapist's continued presence on campus after the Student Conduct Board found L.U. guilty of sexual violence and violation of the law.

To the contrary, the evidence suggests that the administrators responsible for handling L.U.'s appeal were more critical of Ms. Doe than of L.U. After L.U. appealed the expulsion sanction, Ms. Doe contacted Toni Morgan, UAH's Student Conduct Director, and told Ms. Morgan that she wanted the expulsion sanction affirmed. (Doc. 53-3, p. 14). Ms. Morgan conveyed Ms. Doe's message to Dr. Wren. Dr. Wren responded, "I'm just kinda floored that she would want to know the current status of the case." (Doc. 53-3, p. 14). He stated:

> If it is our policy to inform the victim at the same time as the defendant, surely we don't tell the victim whether or not the defendant is appealing. That seems all kinds of wrong to me, let alone the fact that she now wants to give her opinion whether the decision should be upheld or not. It seems that if she wants to give me input, then I should get the right to interview her.

(Doc. 53-3, p. 14). Reasonable jurors could conclude from these statements that Dr. Wren did not accept the Student Conduct Board's sexual violence finding and that

he wanted to question Ms. Doe to see if he could persuade the Student Conduct Board to consider "whether this case should have been brought or not."[20]

- Summary of evidence of deliberate indifference

The evidence summarized above, viewed in the light most favorable to Ms. Doe, creates a question of fact regarding deliberate indifference. In the semesters preceding Ms. Doe's assault, UAH had a record of choosing not to file charges in known instances of forced sex and of allowing students who sexually assaulted others to withdraw from the university before the university imposed sanctions that would impact the students' records. In this instance, Ms. Doe demanded action. As in *Williams*, UAH's police department investigated the assault on Ms. Doe. So did Dr. Hyatt. The Student Conduct Board gave the case a full and fair hearing, found L.U. responsible for sexual violence and a violation of the law, and recommended expulsion.

Then the decisionmakers – the appropriate persons under Title IX – stepped in. They ignored the fact that L.U. was on probation when he assaulted Ms. Doe. They seemed unphased by the undisputed fact that a male student (who was on probation) somehow entered another student's room and took the intoxicated female student he found there to another floor of the dorm under pretense about her safety.

---

[20] Dr. Wren already had asked Dr. Hyatt if "new evidence" could be presented if there were a "re-hearing." (Doc. 53-3, p. 7). Dr. Hyatt told Dr. Wren that a reinvestigation would be atypical. (Doc. 53-3, pp. 7-8).

Though L.U. challenged on appeal only the severity of the sanction that the Student Conduct Board imposed based on its finding that L.U. had engaged in sexual violence and violated the law when he raped Ms. Doe, UAH's Title IX appeal officer questioned whether the case should have been brought at all and looked for ways to reopen the evidence before the Student Conduct Board. UAH's vice president directed the Student Conduct Board to reconvene and consider alternative consequences like alcohol treatment – the very consequence that L.U. had received for his prior offense of alcohol abuse. UAH's president wanted to know why Ms. Doe was not charged with alcohol use. UAH's Title IX appeal officer was indignant that Ms. Doe advocated for L.U.'s expulsion after the Student Conduct Board recommended expulsion. The appeal officer imposed a reduced sanction that allowed L.U. to remain on campus until summer because the officer was concerned about the long-term impact that expulsion would have on L.U., and the officer did not want L.U. to lose credit for the spring semester that was underway. UAH's Title IX appeal officer didn't bother to ask Ms. Doe what safeguards she might require to help her feel safe while L.U. remained on campus, a campus where UAH's hockey coach publicly advocated for L.U.'s innocence after the Student Conduct Board found that L.U. had committed sexual violence and broken the law. When Dr. Hyatt suggested that anyone who had been found guilty of sexual violence was a risk to

the campus community, UAH's Title IX appeal officer gibed to UAH's president and vice president: "Here we go again."

From these facts, reasonable jurors could conclude that UAH protected a male student assailant and was deliberately indifferent to the sexual assault of a female student and the safety of the campus community.

### C. Viewed in the light most favorable to Ms. Doe, the evidence demonstrates that UAH's conduct was so severe, pervasive, and objectively offensive that it effectively barred Ms. Doe's access to an educational opportunity or benefit.

Ms. Doe's sexual assault and UAH's handling of her case impacted her educational experience at UAH. After L.U. assaulted her, Ms. Doe attended UAH counseling. She was prescribed anti-depression and anti-anxiety medication. (Doc. 54-79, p. 12). She considered suicide. (Doc. 54-79, p. 12). She reported that she was "so scared to be asleep by [her]self that [she] slept in the living room with one of [her] roommates for the rest of the semester." (Doc. 54-79, p. 12). She worked two jobs and successfully maintained her grades, (Doc. 53-3, p. 14), but she was "so terrified of people on campus that she rarely left [her] dorm room except to attend classes." (Doc. 54-79, p. 12). Ms. Doe explained that seeing L.U.'s teammates made her "heart drop" and her stomach race. (Doc. 54-79, p. 13). She reported that she had "a hard time focusing in classes or when talking to anyone" because her mind would "just wander[] back to that night over and over again." (Doc. 54-79, p. 13). When she learned that Dr. Wren had changed L.U.'s sanction and allowed L.U. to

remain on campus, she "went to the Dean of Student's Office and had a breakdown." (Doc. 54-79, p. 15). She "deleted and deactivated all of [her] social media accounts for fear of [her] safety." (Doc. 54-79, p. 17). She did not attend her graduation because she was too scared to interact with members of UAH's administration. (Doc. 54-79, p. 16).

In *Williams* and *Hill*, the victims of sexual assault immediately left the schools that they attended. Ms. Doe opted to stay at UAH, but the evidence indicates that her educational experience was forever changed because of L.U.'s assault and the university's response to it. The evidence demonstrates a cycle of discrimination. UAH's administration's prior disregard of student-on-student assaults and the decisionmakers' effort in Ms. Doe's case to protect her assailant made Ms. Doe and other students vulnerable to "further discrimination" or sexual harassment by L.U. or by "like-minded hooligans." *Williams*, 477 F.3d at 1295-97. To protect L.U., the administrators designed a sanction that would have permitted him to stay on campus with Ms. Doe until the end of the spring semester. The only action that UAH took to protect Ms. Doe from L.U. during the spring semester was a no-contact order. A jury must decide whether that was sufficient to prevent future attacks by a student who already was on probation when he assaulted Ms. Doe.

## IV.    CONCLUSION

Having reviewed *de novo* the evidence in this case, for the reasons stated above, the Court denies UAH's motion for summary judgment.  By separate order, the Court will set this case for trial.

**DONE** and **ORDERED** this 13th day of March, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE